## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

OMAR BAKHATY                                                          PLAINTIFF

v.                          Case No. 4:24-cv-00757-LPR

CHI ST. VINCENT HOT SPRINGS;
DR. MEAGHAN MASINI; DR. DAVID
SLAY; and DR. BRETT CLAYTON                                        DEFENDANTS

### ORDER

In this case, Plaintiff Dr. Omar Bakhaty is suing a hospital (CHI St. Vincent Hot Springs) and three of its employees. Dr. Bakhaty, who "is Egyptian and Muslim,"[1] alleges that: (1) he was discriminated against because of his race, religion, and national origin; (2) his employment contract with the hospital was breached; and (3) he was defamed.[2] To remedy these allegedly unlawful acts, Dr. Bakhaty brings the following specific claims:

- a Title VII hostile work environment claim against CHI St. Vincent;[3]

- a Title VII discrimination claim (for termination of his employment) against CHI St. Vincent;[4]

- state-law breach of contract claims against CHI St. Vincent;[5]

- 42 U.S.C. § 1981 discrimination claims against CHI St. Vincent, Dr. Masini, Dr. Slay, and Dr. Clayton;[6] and

---

[1] First Am. Compl. (Doc. 3) ¶ 4.

[2] *Id.* ¶¶ 51, 56, 66, 70.

[3] *Id.* ¶¶ 46–54.

[4] *See id.*

[5] *See id.* ¶¶ 55–60.

[6] *See id.* ¶¶ 61–69. The Court reads the operative Complaint to be alleging § 1981 liability based on an asserted hostile work environment and based on Dr. Bakhaty's termination; but the Court does not read the operative Complaint to be alleging § 1981 liability based on a theory of retaliation. *See id.* ¶¶ 63, 66 (referencing "hostile work environment" and "terminat[ion] on the basis of . . . race, national origin, and religion," but not referencing retaliation). In their briefing, Defendants note that "[i]t is unclear whether Plaintiff is alleging a § 1981 retaliation claim . . . ." Br. in Supp. of Mot. for Partial J. on the Pleadings (Doc. 11) at 9 n.8. In his responsive briefing, Dr. Bakhaty says that, with respect to § 1981, he is "plead[ing] a Hostile Work Environment and Discriminatory Treatment claim." Pl.'s Br. in Opp'n to

- state-law defamation claims against Dr. Masini, Dr. Slay, and Dr. Clayton.[7]

Pending before the Court is Defendants' Motion for Partial Judgment on the Pleadings.[8]  For the reasons discussed below, the Motion is GRANTED IN PART and HELD IN ABEYANCE IN PART.

## BACKGROUND

The following factual recitation is applicable only to this stage of the proceedings.  That is because, when deciding a motion for judgment on the pleadings, the Court must accept as true all factual allegations pled in the operative Complaint.[9]  Of course, even at this stage, the Court need not—and should not—accept as true legal conclusions asserted in the operative Complaint.[10]  Given these parameters, here's the narrative presented to the Court for consideration.

Dr. Bakhaty was educated outside of the United States and then matched with a medical residency program sponsored by CHI St. Vincent.[11]  He and the hospital entered into a written

---

Mot. for Partial J. on the Pleadings (Doc. 17) at 7.  Although the word "retaliation" obliquely appears once in the § 1981 portion of his Brief, more would be necessary to suggest Dr. Bakhaty has brought a retaliation claim under § 1981.  *See id.*

[7] *See* First Am. Compl. (Doc. 3) at ¶¶ 70–91.

[8] Doc. 10.

[9] *See Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002) (citing *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990)) ("While the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."); *see also Westcott*, 901 F.2d at 1488 (stating that the Eighth Circuit reviews "12(c) motion[s] under the standard that governs 12(b)(6) motions").

[10] *See Wiles*, 280 F.3d at 870.

[11] *See* First Am. Compl. (Doc. 3) ¶¶ 4–5.  For a generalized understanding of the "match" process, see *Stepps v. Bd. of Trs. of Univ. of Ark.*, No. 21-cv-00986, 2024 WL 3345336, at *3 (E.D. Ark. July 9, 2024).

Residency Agreement.[12]   But he was terminated from the residency program before the Agreement expired.[13]

Dr. Bakhaty's claims all concern his treatment in and termination from the residency program.  Between the beginning of his residency (on or about July 1, 2022[14]) and his termination (on or about April 21, 2023[15]), Dr. Bakhaty found himself in a multitude of conflicts with various superiors and colleagues.  The Court will discuss these conflicts in turn.

## I.    Conflicts with Program Director Dr. David Slay

At some unidentified point (or points) during the course of Dr. Bakhaty's employment, Dr. Slay made seriously inappropriate comments to Dr. Bakhaty.[16]   For example, Dr. Slay told Dr. Bakhaty that "women over here aren't like women where you come from, women look different here than women where you come from."[17]  Dr. Slay also told Dr. Bakhaty, "You come from a different background.  Where you come from, you oppress women, so you don't know how to treat women.  Women there look different and dress different."[18]  It is not clear when Dr. Slay made these comments, whether the comments were made at the same time as each other or otherwise connected by context, and how frequently Dr. Slay made these comments.[19]  Dr. Bakhaty

---

[12] Ex. B (Original Compl. and Exs.) to Notice of Removal (Doc. 1) at 26.  Although a doctor's medical residency generally extends beyond a year, it is typical for residency agreements to have a one-year term, renewable upon expiration.  *See, e.g.*, *Barsoumian v. Univ. at Buffalo*, No. 06-CV-831S, 2013 U.S. Dist. LEXIS 102808, at *2–3 (W.D.N.Y. July 21, 2013); *Gul v. Ctr. for Fam. Med.*, 2009 S.D. 12, ¶ 2, 762 N.W.2d 629, 631.

[13] First Am. Compl. (Doc. 3) ¶ 17.

[14] Ex. B (Original Compl. and Exs.) to Notice of Removal (Doc. 1) at 28.

[15] First Am. Compl. (Doc. 3) ¶ 17.

[16] *Id.* ¶¶ 8–9.

[17] *Id.* ¶ 9.

[18] *Id.*

[19] *See id.*  Paragraph 9 of the operative Complaint can be read to suggest (or imply) that the statements referred to in the text are just examples of comments made by Dr. Slay.  *See id.* (asserting that Slay would "make comments like" the examples provided and noting that Dr. Slay "made other comments concerning the dress of women of Plaintiff's national origin").  Still, without knowing the tenor and frequency of these other comments, the allegation-by-implication adds little to the mix.  What can be said is that such comments were made by Dr. Slay more than once,

3

alleges that he "protested" this behavior, but he does not say how he protested and to whom he protested.[20]

## II.  Conflicts with Attending Physician Dr. Meaghan Masini

In October of 2022, Dr. Masini accused Dr. Bakhaty of twice pushing a medical student.[21] In fact, Dr. Bakhaty had not done so.[22]  The operative Complaint does not make clear whether Dr. Masini's accusation was written or verbal.  Nor does the operative Complaint identify the person or persons to whom the accusation was made.  But the operative Complaint does make clear that this was not the last false accusation Dr. Masini made against Dr. Bakhaty.

On or about November 8, 2022, Dr. Masini accused Dr. Bakhaty of failing to respond to a rapid response call on a certain patient (who subsequently died).[23]  That patient was not Dr. Bakhaty's patient, and Dr. Bakhaty had no responsibility to respond to a rapid response call.[24] But Dr. Masini nonetheless indicated that Dr. Bakhaty had the responsibility to respond, which

---

because the operative Complaint alleges that Dr. Slay "continued this conduct" even after Dr. Bakhaty "protested" it. *Id.* ¶ 10.

[20] *Id.* ¶ 10.  Dr. Bakhaty's conflict with Dr. Slay was not (according to Dr. Bakhaty) limited to words.  At some point during Dr. Bakhaty's residency, Dr. Slay told Dr. Bakhaty to leave didactics (classroom instruction) early.  *Id.* ¶ 34. Dr. Bakhaty refused because he believed doing so would violate ACGME rules.  *See id.*; *see also Stepps*, 2024 WL 3345336, at *5 (indicating that the ACGME is the Accreditation Council for Graduate Medical Education).  Dr. Slay "punished" (we don't know how) Dr. Bakhaty for remaining in didactics.  First Am. Compl. (Doc. 3) ¶ 34.  Dr. Bakhaty also generally asserts that "Dr. Slay . . . failed to comply with the ACGME rules in Plaintiff's situation, from the very beginning and continued to display a consistent pattern of discrimination and retaliation against Plaintiff."  *Id.* ¶ 32. It suffices to say that nearly all of the foregoing are legal conclusions as opposed to properly pled fact allegations. The only exception is the allegation that Dr. Slay told Dr. Bakhaty to leave didactics early and handed down some sort of consequence when he refused.  But that does not seem very relevant.

[21] First Am. Compl. (Doc. 3) ¶ 16.

[22] *Id.*

[23] *Id.* ¶ 18.  The operative Complaint only says that Dr. Masini "has alleged that Plaintiff was required to respond to a rapid response on a patient for which he had no responsibility."  *Id.*  But the implication from all this is that Dr. Bakhaty did not respond, and that Dr. Masini's accusation encompassed that issue.

[24] *Id.*; *see also id.* ¶¶ 23–24 (explaining that Dr. Bakhaty, as a first-year resident, was not tasked with handling rapid response calls).  Whether Dr. Bakhaty had a "responsibility" to respond is very close to a legal conclusion.  But, out of an abundance of caution, the Court will treat it as a factual allegation.  Apparently, as a first-year resident, Dr. Bakhaty was not included on the Rapid Response Team.  *See id.* ¶ 23.

was untrue.[25]  Again, the operative Complaint does not make clear whether Dr. Masini's accusation was written or verbal.  Nor does the operative Complaint identify the person or persons to whom the accusation was made.

Finally, on or about April 4, 2023, Dr. Masini accused Dr. Bakhaty of "fail[ing] to respond appropriately" to another rapid response call.[26]  Here, in addition to not telling us whether Dr. Masini's accusation was written or verbal and not identifying the person or persons to whom the accusation was made, the operative Complaint is also generally vague and conclusory.  We don't know what Dr. Bakhaty was alleged to have done wrong in his response.  And we don't know whether Dr. Bakhaty is saying that (1) he did not do that particular thing wrong, or (2) he shouldn't have been held responsible for anything done on a rapid response call.[27]

The operative Complaint does say that residents like Dr. Bakhaty only observe rapid response situations for educational purposes, and that they are not responsible for responding to such situations.[28]  And the operative Complaint also says that the rapid response call was issued after Dr. Bakhaty's shift ended.[29]  But none of that is helpful without knowing what Dr. Masini accused Dr. Bakhaty of doing wrong.

According to the operative Complaint, Dr. Slay was aware of some of the "ongoing problems" Dr. Bakhaty was experiencing with supervisors.[30]  The operative Complaint does not,

---

[25] *Id.* ¶ 18.

[26] *Id.* ¶ 21.

[27] The operative Complaint notes that, with respect to this particular rapid response call, Dr. Masini was out of the hospital and Dr. Clayton left the hospital before the call.  *Id.* ¶¶ 19, 25–26.  It is not entirely clear what point is being made through these allegations, but most likely the point is that neither Dr. Masini nor Dr. Clayton faced consequences for not responding to the rapid response call.  *See id.* ¶¶ 20, 22.

[28] *Id.* ¶ 23–24.

[29] *Id.* ¶ 25.

[30] *Id.* ¶ 35.

however, identify any specific problems of which Dr. Slay was aware, and it does not otherwise explain the nature of these "ongoing problems." The only thing the operative Complaint tells us is that whatever those "ongoing problems" were, Dr. Slay did not investigate them and did not take steps to resolve them.[31] Dr. Bakhaty also sought help from at least one cardiologist at CHI St. Vincent, telling that cardiologist that he felt unsafe working with Dr. Masini and another attending physician named Dr. Massey.[32] Dr. Bakhaty "requested assistance with[] this situation."[33] But his concerns were ignored.[34]

### III. Dr. Bakhaty's Termination

In April of 2023, roughly two weeks before his termination, Dr. Bakhaty lodged a complaint (with someone) regarding a medication error (by someone).[35] Dr. Bakhaty complained that a patient suffering from seizures had been prescribed a medication known to cause seizures.[36] Dr. Bakhaty believes that Dr. Slay and the hospital fired him (at least in part) in retaliation for the complaint.[37]

---

[31] *Id.* The operative Complaint alleges that, at some point during Dr. Bakhaty's employment, Dr. Slay said to Dr. Bakhaty: "If you complain about your situation, it will get bloody." *Id.* ¶ 36 (emphasis removed). The operative Complaint does not say when this statement was made or to what situation Dr. Slay was referring.

[32] *Id.* ¶ 37.

[33] *Id.*

[34] *Id.*

[35] *Id.* ¶ 13–15.

[36] *Id.* ¶ 14.

[37] *Id.* ¶ 15. The operative Complaint also describes two other incidents in which Dr. Bakhaty complained about issues with patient care. First, Dr. Bakhaty complained that certain senior physicians did not appropriately treat an infection. *Id.* ¶ 11. Second, Dr. Bakhaty complained about being "left to supervise the entire ICU without appropriate supervision . . . ." *Id.* ¶ 12. The operative Complaint says nothing about when either of these incidents occurred, when Dr. Bakhaty made his complaints, or to whom these complaints were made.

Dr. Bakhaty was terminated on or about April 21, 2023.[38]  The operative Complaint points to several reasons behind the termination.  One is Dr. Masini's October 2022 pushing accusation.[39]  Another is the accusations of inappropriate responses to rapid response calls.[40]  Dr. Bakhaty believes that the residency program never investigated these allegations before terminating him.[41]  A third is the desire to retaliate against Dr. Bakhaty for the reporting of his issues with Drs. Masini and Massey as well as his complaints related to patient care.[42]

Dr. Bakhaty appealed his termination.[43]  But Dr. Bakhaty feels the appeal process was unfair for several reasons.[44]  First, the appeal committee itself was all white and non-Muslim.[45]  Second, Dr. Bakhaty's ability to make his case was repeatedly hampered by CHI St. Vincent: he was not provided documents he needed to support his case;[46] his request to bring in Dr. Clayton as a witness was denied;[47] and the hospital failed to provide written and signed statements from witnesses.[48]  Third, when Dr. Masini was giving testimony, Dr. Slay answered questions directed

---

[38] *Id.* ¶ 17.

[39] *Id.*

[40] *Id.* ¶ 21.

[41] *Id.* ¶ 31.

[42] *Id.* ¶¶ 11–15, 37.

[43] *See id.* ¶ 38.

[44] *Id.*

[45] *Id.* ¶ 39.  Dr. Bakhaty additionally alleges that the members of the appeal committee were also members of the GME committee, but it is unclear why that is important.  *See id.* ¶ 43.  The Court understands GME to be shorthand for Graduate Medical Education.  *Cf.* Ex. B (Original Compl. and Exs.) to Notice of Removal (Doc. 1) at 26 (indicating that ACGME is shorthand for Accreditation Council for Graduate Medical Education).

[46] *Id.* ¶ 38.  Dr. Bakhaty also alleges that during the appeal process, "[l]egal documents and incidents [were] modified and fabricated . . . ."  *Id.*  It is not clear which documents or incidents Dr. Bakhaty is referring to or how those modifications and fabrications affected the appeal process.

[47] *Id.* ¶ 40.

[48] *Id.* ¶ 44.  Dr. Bakhaty also alleges that someone named Bohannan "was giving medical recommendations without a medical background and supporting . . . Dr. Slay, as much as possible, although Plaintiff raised a concern[] regarding Bohannan being the DIO."  *Id.* ¶ 39.  The import of this allegation is unclear.  The operative Complaint doesn't even tell us what a DIO is.

to Dr. Masini in order to protect her, and the appeal committee doesn't appear to have done anything about it.[49]  Dr. Bakhaty raised his concerns about the appeal process with Human Resources.[50]  After he did so, he was approached by a medical student, who informed him that his superiors—including the Defendants—were "prodding others to encourage them to report [Dr. Bakhaty], alleging he was 'aggressive.'"[51]

Long story short, Dr. Bakhaty's appeal appears to have been unsuccessful.

## ANALYSIS

In the Eighth Circuit, the legal standard used to evaluate a Rule 12(c) motion for judgment on the pleadings is the same as the legal standard used to evaluate a Rule 12(b)(6) motion to dismiss.[52]  "To survive a motion for judgment on the pleadings, a 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"[53] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[54]  Those facts must "affirmatively and plausibly suggest that the pleader has the right he claims," whereas "facts that are merely consistent with such a right" are insufficient.[55]  The facts pled "must be enough to raise a right to relief above the speculative level . . . ."[56]  With the forgoing legal standard in mind, the Court turns to the specific claims brought by Dr. Bakhaty on which Defendants seek dismissal.

---

[49] *Id.* ¶ 41.

[50] *See id.* ¶ 45.

[51] *Id.* ¶ 45.

[52] *Westcott*, 901 F.2d at 1488.

[53] *Mickelson v. County of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[54] *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

[55] *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).

[56] *Twombly*, 550 U.S. at 545.

## I. Title VII Claims

CHI St. Vincent seeks to dismiss Dr. Bakhaty's Title VII claims to the extent those claims are predicated on alleged religious discrimination.[57]  According to CHI St. Vincent, such Title VII claims—under both the hostile-work-environment theory and the discriminatory-termination theory—cannot proceed because CHI St. Vincent is a religious organization.[58]  And Congress has made clear that the relevant Title VII discrimination prohibitions "shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."[59]

CHI St. Vincent is correct.  In a nutshell, the just-quoted provision "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion."[60]  And given section 1.2 of Exhibit B to CHI St. Vincent's Residency Agreement[61] and

---

[57] *See* Br. in Supp. of Mot. for Partial J. on the Pleadings (Doc. 11) at 7–8.  The Motion does not seek to dismiss the Title VII claims to the extent they are predicated on alleged racial or national orientation discrimination.  *See id.* Because the Motion does not seek this relief, the Court will not address whether CHI St. Vincent might be entitled to such relief.  Accordingly, Dr. Bakhaty's Title VII hostile-work-environment claims based on race and/or national origin will move forward, as will his Title VII termination claims based on race and/or national origin.  Of course, as previously noted, these claims are brought against CHI St. Vincent alone.  Similarly, CHI St. Vincent does not seek dismissal of Dr. Bakhaty's state-law breach of contract claims against it.  So those claims move forward.

[58] *Id.*

[59] 42 U.S.C. § 2000e-1(a).

[60] *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 329 (1987).

[61] *See* Ex. B (Original Compl. and Exs.) to Notice of Removal (Doc. 1) at 35 ("_Ethical and Religious Directives:_ Resident agrees that his/her performance . . . shall be in accordance with the most recent edition of the *Ethical and Religious Directives for Catholic Health Care Services*, as promulgated by the United States Conference of Catholic Bishops, as amended from time to time, and as interpreted by the local bishop (the '*Directives*').  As of the date of the Agreement, the *Directives* are available at the following website: http://www.usccb.org/[.]  In the event that Hospital determines in good faith that Resident has failed to comply with [these] obligations . . . , Resident shall be considered to be in material breach of the Agreement.").  The referenced website—where the Directives can be found—is the website of the United States Conference of Catholic Bishops.

the public record documents submitted by Defendants,[62] the Court is convinced that CHI St. Vincent is a religious organization to which the exemption applies.[63]

Dr. Bakhaty does not suggest otherwise.  Instead, he argues that (1) the Court cannot consider the public record documents submitted by Defendants on a Rule 12(c) motion, and (2) the allegations in and exhibits attached to the Amended Complaint (including the Residency Agreement) don't "unequivocally establish Defendants' entitlement to [the Title VII] exemption on Plaintiff's religious discrimination claims . . . ."[64]  Dr. Bakhaty is wrong.  On a Rule 12(c) motion, the Court may take judicial notice of and examine public records—such as

---

[62] *See, e.g.*, Ex. 1. (Articles of Incorporation) to Mot. for Partial J. on the Pleadings (Doc. 10-1) at 5 ("[CHI St. Vincent Hospital Hot Springs] is organized and operated exclusively for religious, charitable, scientific, and educational purposes . . . .").  Because they constitute matters of public record, the Court may (and does) take judicial notice of the Articles of Incorporation attached to Defendants' Motion without converting the Motion into one for summary judgment.  *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (2017) (quoting *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012)).

[63] Caselaw supports the Court's conclusion.  Courts in the Eighth Circuit have found Catholic hospitals or healthcare networks to be religious organizations within the meaning of Title VII.  *See, e.g.*, *Cochran v. SSM-SLUH, Inc.*, No. 23CV762, 2024 WL 2846672, *2–5 (E.D. Mo. June 5, 2024) (finding SSM Health to be a religious organization within the meaning of § 2000e-1(a)).  It's worth noting that CHI St. Vincent Hot Springs was previously a Mercy hospital, *see infra* note 66, and "courts have routinely found that Mercy Hospital entities qualify for the religious-organization exemption from Title VII."  *Burlison v. Mercy Hosp. S.*, No. 22-cv-01017, 2023 WL 4560796, at *3 (E.D. Mo. July 17, 2023).  It is also worth noting that, in a non-Title VII context, the Tenth Circuit has stated that "Catholic Health Initiatives (CHI)" was "created to carry out the Roman Catholic Church's healing ministry," and that it operates its hospitals in order to advance that mission.  *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1219 (10th Cir. 2017).  CHI (now known as CommonSpirit Health) is the parent network of CHI St. Vincent Hot Springs.  *Cf.* Ex. B (Original Compl. and Exs.) to Notice of Removal (Doc. 1) at 35 ("<u>Compliance with CommonSpirit Health Standards of Conduct</u>.  Resident recognizes that it is essential to the core values of Hospital that all persons and entities employed by or otherwise contracting with Hospital at all times conduct themselves in compliance with the highest standards of business ethics and integrity and applicable legal requirements, as reflected in the *CommonSpirit Health ('Commonspirit') Standards of Conduct*, as amended from time to time.  As of the Effective Date of the Agreement, the *CommonSpirit Standards of Conduct* are set forth in *Our Values in Action, Policy and Reference Guide* ('E@W Guide'), which is available at the following website:  http://www.catholichealthinitiatives.org/corporate-responsibility[.]  Resident acknowledges that Resident has electronically accessed, obtained or otherwise received a copy of the E@W Guide and has read and understands the same, and hereby agrees that, so long as the Agreement remains in effect, Resident shall act in a manner consistent with, and shall at all times abide by, such *CommonSpirit Standards of Conduct*, to the extent the same are applicable to Resident in the performance of the Agreement.  In the event that Hospital determines in good faith that Resident has breached Resident's obligations pursuant to this Section, Hospital may, upon notice to Resident, immediately terminate this Agreement.").

[64] Pl.'s Br. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 17) at 3.  The Court does not read Dr. Bakhaty as arguing that the Court can't consider the information in the Residency Agreement.  Such an argument would be a non-starter, since Dr. Bakhaty is the one that attached the Agreement to the Complaint.  *See Zean*, 858 F.3d at 526 (quoting *Miller*, 688 F.3d at 931 n.3).

CHI St. Vincent's publicly filed Articles of Incorporation—as long as those public records do not contest a fact allegation in the Complaint.[65]  And when the public records are considered in tandem with the above-referenced section of the Residency Agreement, there is no question of CHI St. Vincent's religious-organization status.  This is not surprising, as CHI St. Vincent's corporate predecessor was a Mercy hospital,[66] and other courts have repeatedly found Mercy hospitals to be religious organizations for purposes of the Title VII exemption.[67]

## II.  § 1981 Claims

One portion of Defendants' request to dismiss the § 1981 discrimination claims is easy. Defendants are correct that discrimination based on religion and discrimination based on national origin are not actionable under § 1981.[68]  In fact, Defendants are so obviously right that Dr. Bakhaty did not try to counter their argument in his Response.  Instead, Dr. Bakhaty appears to recast his § 1981 claims as being based solely on race discrimination.[69]  Given the obvious correctness of Defendants' position and Dr. Bakhaty's clear abandonment of any religion-based and national-origin-based § 1981 claims, Defendants are entitled to dismissal of the religion-based and national-origin-based § 1981 claims.  The Court need not go further on this point.

---

[65] *See Zean*, 858 F.3d at 526 (quoting *Miller*, 688 F.3d at 931 n.3).

[66] *See* Ex. 1 (Articles of Incorporation) to Mot. for Partial J. on the Pleadings (Doc. 10-1) at 1.

[67] *See Burlison*, 2023 WL 4560796, at *3 (finding a Mercy hospital to be a religious organization for purposes of the Title VII exemption and listing cases that held likewise for other Mercy hospitals).

[68] Mot. for Partial J. on the Pleadings (Doc. 10) at 2 n.1 (first citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1053 (8th Cir. 2011); and then citing *Gamble v. Crain*, No. 09CV00096, 2011 WL 873350, at *3 (E.D. Ark. Feb. 23, 2011)).

[69] *See* Pl.'s Br. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 17) at 7 ("Plaintiff alleges race discrimination under 42 U.S.C. § 1981."); *id.* at 7–8 ("The Amended Complaint clearly articulates claims for race discrimination supported by specific factual allegations.").  Dr. Bakhaty also appears to be recasting his allegations of religious and national-origin discrimination as forms of racial discrimination.  *See id.* at 7 ("Plaintiff, an Egyptian Muslim, was subjected to discriminatory slurs . . . including racist remarks about Plaintiff's background and religious practices . . . .").

With respect to the § 1981 racial discrimination claims, Defendants make two arguments in favor of dismissal. First, Defendants argue that Dr. Bakhaty has not alleged facts sufficient to plausibly suggest his race was the but-for cause of his termination.[70] Second, Defendants argue that the § 1981 claims against Dr. Clayton should be dismissed because Dr. Clayton was Dr. Bakhaty's co-worker (not Dr. Bakhaty's supervisor).[71] In this vein, Defendants note that "the Amended Complaint does not allege that Dr. Clayton had the authority to interfere with [Dr. Bakhaty's] Residency Appointment Agreement with the Hospital."[72] As to this part of the Motion, the Court believes it would benefit from oral argument. So the Court will reserve judgment until that argument can be held.[73]

## III.  State-Law Defamation Claims

The operative Complaint alleges three separate instances of defamation, all involving allegedly false accusations about Dr. Bakhaty made by Dr. Masini. The first occurred in October of 2022. The second occurred on or about November 8, 2022. The third occurred on April 4, 2023. As noted in the Background Section of today's Order, it is not clear on the face of the operative Complaint whether these allegedly false accusations were made orally (*i.e.*, slander) or in writing (*i.e.*, libel). Dr. Bakhaty's Response argues that "the Complaint alleges both types of

---

[70] Br. in Supp. of Mot. for Partial J. on the Pleadings (Doc. 11) at 9.

[71] *Id.* at 10. Defendants also argue for dismissal of any § 1981 claims based on a retaliation theory, just in case the operative Complaint was construed to find such claims. *Id.* at 9 n.8. As noted above, however, the Court does not read the operative Complaint to bring such claims.

[72] *Id.* at 10. The Court notes that Defendants do not seem to be arguing—at least not expressly—for dismissal of the § 1981 claims that are based on a hostile-work-environment theory. Of course, this might be because it was unclear to Defendants that Dr. Bakhaty's operative Complaint included such a theory.

[73] In addition to exploring all the arguments expressly set out in the parties' briefing, the Court will want to explore, at oral argument, an additional point—because the point (although not specifically raised by either party) is inextricably intertwined with the arguments that are made by the parties. Specifically, the Court wants to know whether "Egyptian" is a race for purposes of § 1981. Obviously, "Egyptian" is a nationality. But the Court does not foreclose the possibility that "Egyptian" could also constitute a protected racial identity. The Court needs the answer to this question in order to properly evaluate whether Dr. Bakhaty has alleged enough to show that his race was the but-for cause of his termination.

defamation . . . ."[74]  But that isn't really accurate.  The operative Complaint merely alleges defamation without specifying whether it brings libel claims, slander claims, or both.  Indeed, Dr. Bakhaty's supporting Brief all but concedes this.[75]  He thus reframes his argument to contend that "[t]he Amended Complaint alleges defamation, which includes both libel and slander . . . ."[76]

Whether the operative Complaint brings claims for slander or libel (or both) matters.  For one thing, slander and libel have different statutes of limitations.[77]  In Arkansas, "actions for slander shall be commenced within one year after the cause of action accrues, which is the time of publication."[78]  This short one-year statute of limitations can be juxtaposed with the longer three-year statute of limitations for libel actions.[79]  So we can all see why a plaintiff might want to turn an alleged slander into an alleged libel if more than a year has elapsed since publication.

The instant case provides a good example of this scenario.  Dr. Bakhaty filed his original Complaint in Pulaski County Circuit Court on April 19, 2024.[80]  But the latest-in-time alleged defamatory statement was published—that is, was made to a third party[81]—on April 4, 2023.  So any potential slander claims in this case are time-barred.  And the Court is not persuaded by Dr. Bakhaty's arguments to the contrary.

Principally, Dr. Bakhaty contends that the one-year statute of limitations should run from the date he was terminated (April 21, 2023) rather than the date of publication of the allegedly

---

[74] Pl.'s Resp. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 16) at 2.

[75] *See* Pl.'s Br. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 17) at 5.

[76] *Id.*

[77] For purposes of the statute of limitations analysis, the Court will assume that Dr. Bakhaty has brought both slander and libel claims.

[78] *Pinkston v. Lovell*, 296 Ark. 543, 548, 759 S.W.2d 20, 22 (1988).

[79] *See* Ark. Code Ann. § 16-56-105(5).

[80] Compl. (Doc. 2) at 1.

[81] *See Wal-Mart Stores, Inc. v. Dolph*, 308 Ark. 439, 441, 825 S.W.2d 810, 811 (1992).

slanderous statements.[82]  Dr. Bakhaty's point seems to be that: (1) he was not damaged by the (alleged) slander until he was terminated; (2) damage is a necessary ingredient of a cause of action; (3) his slander claim thus did not accrue until April 21, 2023; and (4) he filed his state lawsuit within a year of April 21, 2023.  But this argument runs headlong into well-established Arkansas precedent pegging a slander action's accrual date to the date of publication.[83]  And *Parkman v. Hastings*, the sole case on which Dr. Bakhaty relies, says nothing different.[84]

In an attempt to sidestep this statute-of-limitations problem, Dr. Bakhaty argues "republication" in his response briefing.[85]  He contends that "Plaintiff alleges that[,] after his termination, Defendants, including Dr. Slay and Dr. Masini, continued to repeat or circulate the

---

[82] *See* Pl.'s Resp. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 16) at 2.

[83] *See Milam v. Bank of Cabot*, 327 Ark. 256, 263, 937 S.W.2d 653, 657 (1997) ("It is clear that an action for slander must be brought within one year of publication."); *Pinkston*, 296 Ark. at 548, 759 S.W.2d at 22 ("Ark. Code Ann. § 16-56-104(4) (1987) provides that actions for slander shall be commenced within one year after the cause of action accrues, which is the time of publication."); *Roeben v. BG Excelsior Ltd. P'ship*, 2009 Ark. App. 646, *4, 344 S.W.3d 93, 96 ("The statute of limitations for defamation in the form of slander is one year.  Ark. Code Ann. § 16-56-104(3) (Repl.2005).  The statute begins to run at the time of publication of the alleged slander."); *see also Huff v. Regis Corp.*, No. 16-CV-05083, 2016 WL 3453471, at *3 (W.D. Ark. June 20, 2016) ("In Arkansas, the statute of limitations for slander is one year.  [Ark. Code Ann.] § 16-56-104(3).  The statute of limitations for slander begins to run at the time of publication of the alleged slander.").

This rule makes sense.  As the Arkansas Court of Appeals explained in *Lancaster v. Red Robin International, Inc.*, "[a] plaintiff in a defamation case must prove actual damage to his reputation, but the [necessary] showing of harm is slight.  A plaintiff must prove that defamatory statements have been communicated to others and that the statements have detrimentally affected those relations.  The law does not require proof of actual out-of-pocket expenses."  2011 Ark. App. 706, *8, 386 S.W.3d 662, 668 (citations omitted).  Accordingly, almost invariably, a plaintiff suffers actual reputational damage at the moment of publication, and so the cause of action accrues at that point—rather than after some future pocketbook injury (*e.g.*, termination) is suffered.  *Cf. Ahmed v. Warehouse Distrib. Co.*, No. 17CV00308, 2018 WL 1831174, at *3 (E.D. Ark. Apr. 17, 2018) (finding the cause of action accrued at the time of publication, even though additional damages occurred later); *Thomas v. Univ. of Cent. Ark. Police Dep't*, No. 09cv00902, 2011 WL 1073191, at *2 (E.D. Ark. Mar. 24, 2011) (same).

The bottom line is that the statute of limitations for defamation "begins to run, in the absence of concealment of the wrong, when the wrong occurs, not when it is discovered."  *Harrell v. Parker*, No. 13CV00490, 2014 WL 12650687, at *2 (W.D. Ark. July 30, 2014) (citing *Gibson v. Herring*, 63 Ark. App. 155, 157–58, 975 S.W.2d 860, 862 (1998)).  And "once it is clear from the face of the complaint that an action is time-barred, the burden shifts to the plaintiff to prove by a preponderance of evidence that the statute of limitation was tolled," by fraudulent concealment or otherwise.  *Milam*, 327 Ark. at 263, 937 S.W.2d at 657.  Dr. Bakhaty has not argued for such tolling.

[84] 259 Ark. 59, 63, 531 S.W.2d 481, 483 (1976).

[85] Pl.'s Br. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 17) at 5–6.

false allegations concerning his conduct . . . ."[86]  But the operative Complaint doesn't actually allege that Drs. Slay and Masini continued to repeat or circulate the false accusations after Dr. Bakhaty's termination.  Moreover, if Dr. Slay simply repeated his own accusations and Dr. Masini repeated her own accusations, this is not "republication."  "Republication" requires repetition of a false statement by a third party—*i.e.*, a person who did not make the original statement.[87]  Without "republication," all the pre-termination slander claims in this case are time-barred.

So, the question becomes whether Dr. Bakhaty stated any viable libel claims.  To plead a prima facie case of libel under Arkansas law, a plaintiff must allege facts which, taken as true, would be sufficient to satisfy six elements: "(1) the defamatory nature of the [written] statement of fact; (2) that [written] statement's identification of or reference to the plaintiff; (3) publication of the [written] statement by the defendant; (4) the defendant's fault in the publication; (5) the [written] statement's falsity; and (6) damages."[88]  Governed by this standard, Dr. Bakhaty has failed to state a viable libel claim.

As an initial matter, although Dr. Bakhaty's operative Complaint (and briefing) states that he is asserting defamation claims against Drs. Masini, Slay, and Clayton,[89] the operative Complaint does not set out any alleged defamatory statements (oral or written) made by Drs. Slay and

---

[86] *Id.* at 5.

[87] M.C. Dransfield, Annotation, *Liability of Publisher of Defamatory Statement for its Repetition or Republication by Others*, 96 A.L.R.2d § 373.  Dr. Bakhaty does allege that, during the appeal process, Defendants "were prodding others to encourage them to report Plaintiff, alleging he was 'aggressive.'"  First Am. Compl. (Doc. 3) ¶ 45.  This doesn't help Dr. Bakhaty on the republication front.  There's no allegation that any of the "prodded" people actually made reports.

[88] *Faulkner v. Ark. Childs. Hosp.*, 347 Ark. 941, 955–56, 69 S.W.3d 393, 402 (2002).

[89] First Am. Compl. (Doc. 3) ¶ 70; Pl.'s Br. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 17) at 4.

Clayton.[90]  Only Dr. Masini is alleged to have made a defamatory statement.[91]  Accordingly, any

defamation claims against Drs. Slay and Clayton—whether about libel or slander—cannot survive

the Motion for Judgment on the Pleadings.[92]

As to Dr. Masini, the operative Complaint fails to plead facts which, taken as true, would

state a viable claim for libel against her.  The operative Complaint never indicates that any of

Dr. Masini's accusations were reduced to writing.  The operative Complaint never actually says

that Dr. Masini published any written accusations to any third party.  The operative Complaint

doesn't include any information identifying to whom a written statement was published or what

that written statement said.  Perhaps the operative Complaint could do these things.  But, as of

now, it has not done them.

---

[90] The operative Complaint does state that "Dr. Clayton's false statements were missing important information and [were] modified to support CHI and therefore defamatory."  First Am. Compl. (Doc. 3) ¶ 42.  But this allegation is too sparse and too conclusory to support a defamation claim.  The operative Complaint does not provide any information whatsoever about the content of these alleged false statements, to whom they were published, when they were published, or any actual reputational damages they caused.

In Dr. Bakhaty's responsive briefing, he contends that "Masini and Clayton falsely claimed that Plaintiff failed to appropriately respond to a rapid response call, despite Plaintiff having no responsibility for that patient and having been dismissed from his shift prior to the event."  Pl.'s Br. in Opp'n to Mot. for Partial J. on the Pleadings (Doc. 17) at 5.  But the operative Complaint only makes this allegation against Dr. Masini.  *See* First Am. Compl. (Doc. 3) ¶ 21. A complaint cannot be amended by way of a brief.

[91] *See supra* page 12.  It is true that the operative Complaint also alleges that Dr. Slay "falsely alleg[ed] Plaintiff was aggressive and engaging in unsafe health care activities."  First Am. Compl. (Doc. 3) ¶ 86.  But this barebones allegation is nowhere near enough to state a plausible defamation claim against Dr. Slay.  Dr. Bakhaty never alleges when the false allegations were made, to whom they were made, or that they caused actual reputational harm.  *See Faulkner*, 347 Ark. at 957, 69 S.W.3d at 403 ("Actual damage . . . is an element of defamation . . . and Arkansas no longer recognizes the doctrine of defamation *per se* . . . .").  Simply put, even if all the factual allegations in the operative Complaint were accepted as true, Dr. Bakhaty wouldn't have a viable defamation claim against Dr. Slay.

[92] As noted *supra* page 8, Dr. Bakhaty also alleges that, during the appeal process, "Plaintiff's superiors, including Defendants, were prodding others to encourage them to report Plaintiff, alleging he was 'aggressive.'"  First Am. Compl. (Doc. 3) ¶ 45.  This allegation is insufficient to sustain a defamation claim against any of the Defendants. Among other things, Dr. Bakhaty fails to allege that any actual reputational damage resulted from this "prodding." *See Faulkner*, 347 Ark. at 957, 69 S.W.3d at 403.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Judgment on the Pleadings is GRANTED IN PART and HELD IN ABEYANCE IN PART.[93]  To the extent the Motion requests dismissal of the race-based § 1981 claims, the Motion is held in abeyance pending oral argument. Otherwise, the Motion is granted.  Dr. Bakhaty's religion-based Title VII claims, religion-based and national-origin-based § 1981 claims, and state-law defamation claims are all dismissed without prejudice.[94]

If Dr. Bakhaty wants another crack at amending his Complaint, and if he believes that doing so would remedy some or all of the defects identified by today's Order, he may file a Motion for Leave to Amend within 21 days of the date of the Order that completely resolves the Motion for Partial Judgment on the Pleadings.  That Order will be issued at or sometime after the upcoming oral argument.  Any Motion for Leave to Amend must, of course, comply with all relevant Federal Rules of Civil Procedure and all relevant Local Rules.

IT IS SO ORDERED this 3rd day of June 2025.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[93] Doc. 10.

[94] The Court finds without-prejudice dismissal to be more appropriate than with-prejudice dismissal.  Here, a Rule 12(c) motion is being used to advance what is essentially a Rule 12(b)(6) argument.  And had this been a Rule 12(b)(6) motion, the Court would certainly have granted dismissal without prejudice.  The Court sees no reason to do things any differently just because it has a Rule 12(c) motion before it rather than a Rule 12(b)(6) motion.  *See Reep v. Malco Theatres, Inc.*, No. 23-cv-00746, 2025 WL 371512, at *5 (E.D. Ark Feb. 3, 2025).